

# Immigration Daily

Find a Lawyer          More Options
State: All          Find

Home Page

SEARCH  GO
Advanced search

**Immigration Daily:** the news source for legal professionals. **Free!** Join 14000+ readers

Enter your email address here:
Enter email address   Go

< Back to current issue of Immigration Daily          < Back to current issue of Immigrant's We

**IMMIGRANTS & EMPLOYERS**
Find a lawyer
For employers
Processing times
Immigration forms
Immigrant's Weekly
Immigration info
New to America
Chat with lawyers
Discussion board
Lawyers.com
Immigration Canada

**LAWYERS**
Immigration Daily
Archives
Classifieds
Seminars
Immigration books
Yellow pages
Processing times
Immigration forms
Immigration Canada

About ILW.COM
Testimonials
Non-profit

**SUBSCRIBE**
Enter email:
Immigration Daily
enter email  GO

Immigrants Weekly
enter email  GO

Share this page
Bookmark this page
Print this page

Find a Lawyer
State:
All
Find

The Immigration Portal from the leading immigration law publisher - over 25000 pages of free information!

PRECEDENTIAL

        Filed April 16, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 01-1331

JIMMY JOHNSON,
        Petitioner

v.

JOHN ASHCROFT, Attorney General
of the United States

On Petition for Review of an Order
of the Board of Immigration Appeals
(No. A73 149 183)

Argued November 7, 2001

Before: BECKER, Chief Judge, and McKEE
and RENDELL, Circuit Judges

(Filed April 16, 2002)

        Visuvanthan Rudrakumaran
          [ARGUED]
        Suite 2309
        875 Avenue of the Americas
        New York, NY 10001
        Counsel for Petitioner
        Jimmy Johnson


        William C. Minick [ARGUED]
        Michael P. Lindemann
        Christopher C. Fuller

        Alison M. Igoe
        Office of Immigration Litigation
        Civil Division, Department of Justice
        P. O. Box 878
        Ben Franklin Station

EXHIBIT  01

Copyright
© 1999-2004
ILW.COM,
American
Immigration LLC.



SEARCH [GO]

Advanced search

Home Page

Washington, DC 20044
Counsel for Respondent

OPINION OF THE COURT

RENDELL, Circuit Judge.

Jimmy Johnson petitions for review of a Board of

Immigration Appeals ("BIA" or "Board") order reversing a
grant of asylum and withholding of deportation based on
changed country conditions.

The BIA held that the Immigration Judge did not have
jurisdiction over these claims at the time he considered

Johnson's application for relief under the Convention
Against Torture and Other Cruel, Inhuman or Degrading
Treatment or Punishment ("CAT")1 because the case had
been reopened and remanded for the "sole purpose" of
considering the CAT claim. The question before us is
whether on remand the Immigration Judge's jurisdiction
was limited to the CAT issue. For the reasons below, we
conclude that, in deciding that it was limited, the Board
departed without reasonable explanation from its own
policy that it established in Matter of Patel , 16 I. & N. Dec.

600 (BIA 1978). Accordingly, the Petition for Review will be
granted and we will vacate the Board's order and remand
for further proceedings consistent with this opinion.

_____

1. G.A. Res. 39/46 (annex), U.N. GAOR, 39th Sess., Supp. No. 51, at
197, U.N. Doc. A/39/51 (1984).

2

I.

When Johnson entered the United States from Liberia in
1994 without a valid visa or travel documents, he was
placed in exclusion proceedings and taken into custody by
the Immigration and Naturalization Service ("INS"). His
initial application for asylum under Immigration and
Naturalization Act ("INA") S 208, 8 U.S.C. S 1158, and
withholding of deportation under former INA S 243(h), 8
U.S.C. S 1253(h) (1995), was denied and he was ordered
excluded. The Board affirmed on appeal.

Johnson then filed a motion with the Board to reopen
and/or reconsider asylum and withholding of deportation in
1996. In a published opinion, the Board denied the motion
as untimely, holding that the motion to reconsider was
more than 60 days late, that the motion to reopen was 2
days late, and that a motion is "filed" when it is received
rather than when an applicant in custody sends it. See In
re J-J-, 21 I. & N. Dec. 976 (BIA 1997). The Board
considered the exception to the timeliness requirements for
motions to apply for asylum based on changed



circumstances in the applicant's country of nationality, see
8 C.F.R. S 3.2(c)(3)(ii), but concluded that the exception did
not apply because Johnson failed to provide material
evidence of changed conditions that was unavailable at
prior hearings. See In re J-J-, 21 I. & N. Dec. at 981-82.

In 1999, Johnson filed a motion with the Board to reopen
for consideration of relief under CAT, which the Board
granted. The Board's order provided that

> [W]e . . . remand this matter to the Immigration Court
> for consideration of the respondent's claim pursuant to
> [CAT] regulations.

. . .

> FURTHER ORDER: The record is remanded to the
> Immigration Judge for further proceedings consistent
> with the foregoing opinion and for the entry of a new
> decision.

The effect of this remand order is at issue here.

While the case was on remand, Johnson made a written
motion before the Immigration Judge urging the court"to

3

consider the respondent's eligibility for asylum in the
proceedings based on changed country conditions." The
Immigration Judge considered this motion as well as the
motion to withhold deportation under CAT, ultimately
granting both.

In his decision, the Immigration Judge addressed
whether his jurisdiction was limited to the CAT claim. While
acknowledging that the Board and the Supreme Court have
set a high standard for reopening immigration proceedings
because of the interest in finality, see, e.g. , INS v. Abudu,
485 U.S. 94, 107 (1988); In re A-G-, 19 I. & N. Dec. 502,
503-04 (BIA 1987), he reasoned that the decision was no
longer final once the case had been reopened, so that this
interest was not implicated. Moreover, he made the point --
uncontested by the INS -- that if Johnson had become
eligible for adjustment of status in the meantime, that
matter could have been entertained by him on remand.
This, he stated, supported his view that "issues besides
that for which the Board specifically reopened the case"
could be heard on remand. He found that application of
this principle was particularly appropriate in these
circumstances, where so much of the evidence of the CAT
claim was relevant to the asylum claim as well.

The INS appealed the Immigration Judge's decision to the
Board, which affirmed the grant of withholding relief under
CAT, but vacated the grant of asylum and withholding of
deportation. The Board did not address the merits of the
asylum claim, but rather vacated on the ground that the
Immigration Judge had lacked jurisdiction to consider the

EXHIBIT    01

motion because the Board's remand referred jurisdiction
back to the Immigration Judge only as to the CAT motion.

In its opinion, the Board began by citing the general rule
that "a remand, unless the Board qualifies or limits it for a
specific purpose, is effective for the stated purpose and for
consideration of any and all matters which the Immigration
Judge deems appropriate in the exercise of his
administrative discretion or which are brought to his
attention in compliance with the appropriate regulations."
Citing Matter of Patel, 16 I. & N. Dec. 600 (BIA 1978))
(Board's emphasis). It then pointed out that the standards

4

to reopen for relief under CAT are more easily satisfied than
those to reopen for other purposes.

Finally, the Board looked to the background regulations
and the relief sought in Johnson's motion to reopen for
consideration under CAT, reasoning that both indicated
that "the applicant's motion was filed to pursue this limited
form of relief and, thus, was granted and remanded to the
Immigration Judge for the limited purpose of entertaining
his application for relief pursuant to [CAT]." Specifically, the
Board pointed to the regulation providing that an alien
under final order of exclusion "may move to reopen
proceedings for the sole purpose of seeking" withholding of
removal under CAT. 8 C.F.R. S 208.18(b)(2). 2 For all of these
reasons, it concluded that the Immigration Judge's
jurisdiction on remand was limited to the CAT claim.

Johnson filed a timely appeal of the portion of the
Board's order vacating the Immigration Judge's grant of
asylum and withholding of deportation.

II.

We have jurisdiction under INA S 106, 8 U.S.C.
S 1105a(a), as modified by the Illegal Immigration Reform
and Immigrant Responsibility Act of 1996 ("IIRIRA").3 While
we will often defer to agency interpretations in the
immigration context, see Chevron, U.S.A., Inc. v. Natural
Res. Def. Council, 467 U.S. 837 (1984); Abdille v. Ashcroft,
242 F.3d 477, 484-85 (3d Cir. 2001) (citing INS v. Aguirre-
Aguirre, 526 U.S. 415, 424-25 (1999)), this case concerns
the scope of jurisdiction of the Immigration Judge and the
BIA as it has been interpreted in the BIA's own precedent.
The parties and the Board agree that it rests essentially on
one decision -- Matter of Patel, 16 I. & N. Dec. 600 (BIA

---

2. This provision applies only to aliens like Johnson who were "orde
removed, or whose removal orders became final, before March 22, 1999
8 C.F.R. S 208.18(b)(2).

3. We note that we do not need to decide which rules apply because t
matter was reviewable under the old rules, see INA S 106, and is no
any of the categories affected by the IIRIRA's transitional or perma

**EXHIBIT    01**

rules, see IIRIRA S 309(c)(4); INAS 242, 8 U.S.C. S 1252.

5

1978). Immigration regulations provide that Patel, because
it is a published opinion, "shall serve as precedent[ ] in all
proceedings involving the same issue or issues." 8 C.F.R.
S 3.1(g). The issue before us, therefore, is whether the
Board departed from its own precedent.

Although an agency can change or adapt its policies, it
acts arbitrarily if it departs from its established precedents
without "announcing a principled reason" for the departure.
Fertilizer Inst. v. Browner, 163 F.3d 774, 778 (3d Cir. 1998)
(noting the well-established rule that an agency can depart
from precedent only with explanation); see also Motor
Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463
U.S. 29, 41-43 (1983); Chisholm v. Defense Logistics
Agency, 656 F.2d 42, 47 (3d Cir. 1981) (agencies must
follow, distinguish, or overrule their own precedent).
Numerous courts have applied this principle in the
immigration context,4 as we do here. Further, if it departs
from an announced rule without explanation or an"avowed
alteration," such action could be viewed as "arbitrary,
capricious, [or] an abuse of discretion." INS v. Yang, 519
U.S. 26, 32 (1996). Here, the Board has not announced an
alteration of the policy set forth in Patel. Thus, if the Board
did in fact depart from Patel, it acted arbitrarily and we
should overturn its ruling.

III.

We begin our analysis with a discussion of the Board's
opinion in Matter of Patel, 16 I. & N. Dec. 600 (BIA 1978),
in which the Board established the standard for the scope

_____

4. See Salameda v. INS, 70 F.3d 447, 450 (7th Cir. 1995) ("An agency
may not abandon an interpretation without an explanation . . . .
Agencies do not have the same freedom as courts to change direction
without acknowledging and justifying the change."); Davila-Bardales
INS, 27 F.3d 1, 5 (1st Cir. 1994) (requiring the BIA to "confront th
squarely and explain why the departure is reasonable" when it depart
from its own precedents); Israel v. INS, 785 F.2d 738, 740 (9th Cir.
(the BIA acts arbitrarily when it disregards its own precedents and
policies without "reasonable explanation"); Moret v. Karn, 746 F.2d
992 (3d Cir. 1984) (the INS abused its discretion where it failed to
its own internal procedures).

6

of remand orders in immigration proceedings. While few
cases or Board decisions elaborate on Patel's standard, and
its language is often quoted without elaboration, 5 it is
widely acknowledged to govern this situation. This is not
disputed here: the parties and the Board simply offer
competing interpretations of the standard the case sets
forth.



Before the Board in Patel was a motion to reopen proceedings so that the respondent could apply for relief under S 244(a)(1) of the INA, 8 U.S.C. S 1254(a)(1). In a two-page decision, the Board found that it lacked jurisdiction to decide this motion because it previously reopened the case for consideration of respondent's rights under asylum provisions and had remanded the case. Accordingly, the Immigration Judge, and not the Board, had jurisdiction.6 Patel set forth the relevant test as follows:

> [W]hen the Board remands a case to an immigration judge for further proceedings, it divests itself of jurisdiction of that case unless jurisdiction is expressly retained. Further, when this is done, unless the Board qualifies or limits the remand for a specific purpose, the remand is effective for the stated purpose and for consideration of any and all matters which the Service officer deems appropriate in the exercise of his administrative discretion or which are brought to his attention in compliance with the appropriate regulations.

Id. at 601.

Under this formulation, the Board will have no continuing jurisdiction if remand is ordered, unless the

---

5. E.g., In re L-V-K-, Int. Dec. 3409, 1999 WL 607159 (BIA Aug. 10, (dissent) (citing Patel for the proposition that "[o]nce a case is r such a remand, unless specifically limited, is for any appropriate purpose"); CHARLES GORDON ET AL., 1 IMMIGRATION LAW AND PROCEDURE S 3.05[5][b], at 3-55 (Dec. 2000) (citing Patel).

6. In the same decision, the Board denied another respondent's motio to reopen for relief under S 244 because he failed to make out a pri facie case of eligibility, but this portion of the decision is not r here.

7

Board has "expressly retained" jurisdiction. And, even if it has expressly retained jurisdiction,7 the Immigration Judge on remand can consider the stated purpose and other appropriate matters unless the remand is qualified or limited to a specific purpose. That is, for the Board to retain jurisdiction over all but a narrow issue, generally it must do two things in the text of its remand order: expressly retain jurisdiction, and limit the remand to a specific purpose. The Board did not do either here.

1. Express retention of jurisdiction

The government argues that the Board limited the Immigration Judge's jurisdiction by stating that "we . . . remand this matter to the Immigration Court for consideration of the respondent's claim pursuant to [CAT] regulations" and citing the relevant regulations. It proposes

EXHIBIT    0 1

that this same language both expressly retained Board
jurisdiction over everything but Johnson's CAT claims, and
qualified and limited the remand to this specific purpose.
By reaching this conclusion without considering separately
the "express retention" and "qualifying or limiting"
requirements, it ignores the fact that Patel implies that
there are at least some circumstances in which language
could expressly retain jurisdiction without qualifying or
limiting the remand. Otherwise, Patel's second sentence --
"Further, when this is done . . ." -- would be superfluous.
Accordingly, we examine each of Patel's requirements in
turn, beginning with its statement that the Board generally
no longer has jurisdiction when it has remanded a case,
except when it "expressly retains" jurisdiction over it.

Patel itself does not elaborate on the concept of "express
retention" of jurisdiction. After setting forth the test, it
simply states that the remand order at issue was "not
limited or qualified," bypassing analysis of "express
retention." And, there is no caselaw discussing how we
should interpret this language in this context. We thus turn

---

7. Linguistically Patel's phrase "when this is done" could refer eit
"when the case is remanded" or to "when jurisdiction is expressly
retained," but logically it refers to the latter. If the Board simpl
without retaining any jurisdiction, it makes no sense to define the
of its un-retained jurisdiction.

8

for guidance to the common definition of "express" as
"explicit," in contrast to implicit or inferred. Black's Law
Dictionary, for instance, defines "express" as "[c]lear;
definite; explicit; plain . . . . Made known distinctly and
explicitly, and not left to inference." BLACK'S LAW DICTIONARY
580 (6th ed. 1990). Other dictionaries give substantially
similar definitions. See, e.g., WEBSTER'S THIRD NEW
INTERNATIONAL DICTIONARY 803 (1993) (defining "express" as
"directly and distinctly stated or expressed rather than
implied or left to inference . . . definite, clear, explicit,
unmistakable").

The most obvious way for a tribunal to "expressly retain
jurisdiction" is by stating that it is doing precisely that. In
In re Prudential Ins. Co. of Am. Sales Practice Litig., 261
F.3d 355, 367 (3d Cir. 2001), we characterized the district
court as having "expressly retained exclusive jurisdiction"
over certain settlement proceedings where its order simply
stated that it "retain[ed] exclusive jurisdiction as to all
matters relating to [settlement] administration." In re
Prudential Ins. Co. of Am. Sales Practice Litig., 962 F. Supp.
450, 566 P 10 (D.N.J. 1997). And in other situations where
the adjective "express" is used, we have viewed it as
requiring an actual, stated reference or mention. In
Berckeley Inv. Group, Ltd. v. Colkitt, 259 F.3d 135, 141 (3d
Cir. 2001), for instance, we found no "express
determination" that there was no just reason for delay
where the district court's order did not use the phrase `no

**EXHIBIT    01**

just cause for delay' or any similar statement.

Here, the remand order did not state that the Board
retained jurisdiction, nor did it make any reference at all to
the Board's jurisdiction. In this context, we see no reason
to interpret "express" in a way other than as it is commonly
understood. Given Patel, we cannot conclude that the order
on its face expressly retained jurisdiction.

2. Qualification or limitation to a specific purpose

Even had the Board expressly retained jurisdiction, our
inquiry would not end there. Patel then tells us: "[f]urther,
when this is done, unless the Board qualifies or limits the
remand for a specific purpose, the remand is effective for
the stated purpose and for consideration of any and all

9

matters . . . ." It, thus, provides for two possible scenarios.
If the Board "qualifie[d] or limit[ed] the remand for a specific
purpose," then the Immigration Judge would be limited to
that purpose. But if the Board did not include such
qualifications or limitations, then the Immigration Judge
could appropriately consider the stated purpose and "any
and all matters" deemed appropriate or brought under
relevant regulations.

Clearly, here, the Board did state a purpose --
consideration of Johnson's CAT claims. But the language of
Patel just quoted contemplates that an order can articulate
a purpose without being qualified or limited. The general
rule that a remand encompasses the stated purpose and
other matters clearly assumes and anticipates the normal
practice of the Board, namely a remand for a stated
purpose. Under Patel, the Immigration Judge's jurisdiction
is narrowed only when the remand order is qualified or
limited, which, given the structure of Patel's sentence, must
be more than a statement of purpose alone.

Although the Board stated a purpose, it did not limit or
qualify the remand, so the Immigration Judge could then
hear a wide range of matters. The government urges us to
find that "[b]y explicitly stating that it was remanding the
petitioner's case for consideration pursuant to regulations
that govern claims under the Convention Against Torture
only, the Board specifically limited and qualified the basis
of its remand." The difficulty with this argument is that
Patel assumes a purpose will be "stated," as it was, but
none of the limiting language that the government points to
in its papers -- "only" and "sole and express purpose" -- or
that the Board points to in its decision -- "sole purpose" --
appears in the order. Without such limiting language, the
order contains nothing more than a stated purpose.

We note, further, that the remand at issue here is similar
to the one in Patel, which the Board found was not
qualified or limited, in that it refers to a specific regulatory
provision. In Patel, the Board had previously ordered

**EXHIBIT   01**

reopening in view of respondent's rights under a particular
asylum provision, Patel, 16 I. & N. Dec. at 601, whereas
here the order referred to the CAT regulations. This

10

statement of a purpose was not a limitation in Patel, so it
similarly should not be in this situation.

3. The scope of the Immigration Judge's jurisdiction

Because the Board's order stated a purpose but did not
limit remand to that purpose, Patel instructs that the
Immigration Judge could consider Johnson's CAT claims
and "any and all matters which [the Immigration Judge]
deem[ed] appropriate in the exercise of his administrative
discretion or which [were] brought to his attention in
compliance with the appropriate regulations." Patel, 16 I. &
N. at 601 (emphasis added). For the reasons below, we
believe that the asylum claim was the type of matter that
Patel contemplated an Immigration Judge would hear in
these circumstances.

In its opinion, the Board focused on the second part of
Patel's sentence, which refers to the "appropriate
regulations." Not only did the Board emphasize the phrase
when quoting Patel's key passage, but it also characterized
Patel as "requiring purposes for remand to be in compliance
with the appropriate regulation." But this is not what Patel
says. Instead, the phrase refers to the manner of bringing
matters to the Immigration Judge's attention, and--
particularly with its use of "any and all"-- seems to be an
expansive, not a narrowing, phrase.

The Board's ruling here might also be viewed as opining
that the motion was not brought in compliance with
8 C.F.R. S 208.18(b)(2), the regulation that allows motions
"to reopen proceedings for the sole purpose of seeking"
withholding of removal under CAT. But if we were to
concede that use of the word "sole" in this regulation was
sufficient to restrict the Immigration Judge's jurisdiction on
remand, that would be entirely inconsistent with Patel. The
Board did not address this issue, but seems to have either
misread Patel or decided that somehow the regulation is a
jurisdictional limitation that trumps Patel. The latter seems
unlikely because the Board does rely on Patel as well.

The Board also pointed out in its opinion that Johnson's
motion for asylum relief would have been time barred and
would have exceeded the permissible number of motions if
it had been deemed a motion to reconsider the Board's prior

11

decision. 8 C.F.R. S 3.2(b)(2) (establishing a filing deadline
for motions to reconsider and limiting them to one per
decision). This argument was not pursued on appeal, but
even if it had been, it is not relevant at this stage of the


EXHIBIT 01

proceedings. These time and numerical limitations do not apply to motions to reopen based on changed country circumstances where the movant shows evidence of changed conditions that "is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. SS 3.23(b)(3), 3.2(c)(3)(ii).8 The Board did not reach the issue of whether this standard was appropriately met or applied because it based its conclusion on the scope of the Immigration Judge's jurisdiction, as defined by the remand order.

The government similarly pointed out that this was Johnson's second motion to reopen for consideration of asylum based on changed country conditions, and that the Board had denied the previous one. See In re J-J-, 21 I. & N. Dec. 976 (BIA 1997). But its argument that Johnson was impermissibly readjudicating his asylum claim is not addressed to the Immigration Judge's jurisdiction on remand, and, even if it were, the regulations specifically permit "readjudication" when the requirements for showing changed country conditions are met. See 8 C.F.R. SS 3.23(b)(3), 3.2(c)(3)(ii). None of this amounts to a regulatory prohibition against the consideration of asylum based on changed country conditions.

Patel states that the Immigration Judge may hear such matters "or" those deemed appropriate in the exercise of the judge's discretion. Presumably this discretion has limits. The Board's decision in In re J-J-, 21 I. & N. Dec. 976 (BIA 1997), for instance, noted that the Board's power to reopen cases on its own motion was "not meant to be used as a general cure for filing defects or to otherwise circumvent the regulations." Id. at 984. Assuming that a similar standard would apply where the Immigration Judge's

---

8. Motions to reopen based on changed country conditions are an exception to the rule that motions to reopen are normally limited to per alien and must be filed no later than 90 days after the final administrative decision. See 8 C.F.R. S 3.2(c)(2).

12

discretion, rather than the Board's discretion, is at issue, we do not view the Immigration Judge's consideration of Johnson's motion to run afoul of the regulations. Nor do we view his addressing this issue to be an inappropriate exercise of his discretion, especially given the factual overlap among Johnson's claim for asylum, statutory withholding of deportation, and withholding of deportation under CAT.9

IV.

The Board's ruling that the Immigration Judge did not have jurisdiction runs counter to its own dictates in Patel, which contemplates that, in most cases, the Immigration Judge will have broad jurisdiction over the case on remand. This reading of Patel finds additional support from the

EXHIBIT 01

policy expressed by the Executive Office for Immigration
Review in the Board of Immigration Appeals Practice
Manual, which states: "Once a case has been remanded to
the Immigration Judge, the only motion that can be
entertained by the Board is a motion to reconsider the
decision to remand. All other motions must be filed with
the Immigration Judge." DEPARTMENT OF JUSTICE, EXECUTIVE
OFFICE FOR IMMIGRATION REVIEW, BOARD OF IMMIGRATION APPEALS
PRACTICE MANUAL S 5.2(a)(iii)(B) (Nov. 1, 1999). While the
manual does not have the weight of a law or regulation and
does not affect the Board's jurisdiction, see id. S 1.1(c), or
our ruling, we note that the policy it expresses is consistent

---

9. The first two claims require a showing that Johnson's life or fre
would be threatened "on account of race, religion, nationality,
membership in a particular social group, or political opinion," whil
requires a showing that it is more likely than not that the alien wo
be tortured upon return to his or her country. Compare INA S 208, 8
U.S.C. S 1158, and former INA S 243(h), 8 U.S.C. S 1253(h) (1995)
(current version at INA S 241(b)(3), 8 U.S.C.S 1231(B)(3)), with 8 C
S 208.16(c)(2). The INS itself has recognized the similarity of thes
of claims in general: in the interim rule establishing procedures fo
claims, it noted that the same application form is used for asylum,
withholding of removal, and relief under CAT because in many cases "
underlying facts supporting these claims will be the same." Regulati
Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8485
(Feb. 19, 1999).

13

with the jurisdictional view expressed by the BIA in Patel,
and with the result we reach.

If the Board departs from Patel, it should provide a
reasonable explanation for its departure. It is possible that
it viewed the regulatory language (i.e.,"sole purpose") as
effecting a limitation on jurisdiction, but that appears to
run counter to the jurisdictional scheme reflected in Patel.
The Board did not explain its departure and, therefore, its
disregard of its own precedents was arbitrary. Because we
view its ruling as a departure and because an agency
should explain a departure, we will GRANT the petition for
review, VACATE the Board's order, and REMAND for
further consideration in light of this opinion.

A True Copy:
Teste:

           Clerk of the United States Court of Appeals
           for the Third Circuit

14.

Copyright © 2002 American Immigration LLC, ILW.COM

EXHIBIT    01

**Immigration Daily:** the news source for legal professionals. **Free!** Join 14000+ readers

Enter your email address here:
Enter email address  **Go**

Search for: Enter keyword(s)  **Search**  Advanced search

**Immigrants & Employers**
- Find a lawyer
- For employers
- Processing times
- Immigration forms
- Immigrant's Weekly
- Immigration info
- New to America
- Chat with lawyers
- Discussion board
- Lawyers.com
- Immigration Canada

**For Lawyers**
- Immigration Daily
- Archives
- Classifieds
- Seminars
- Immigration books
- Yellow pages
- Processing times
- Immigration forms
- Immigration Canada

**About us** | **Testimonials** | **Non-profit**

**FIND A LAWYER**                                    **More options**

State:                Specialty:                Language:
All                   All                       All        **Find**

**Share this page** | **Bookmark this page** | **Print this page**

**The Immigration Portal from the leading immigration law publisher**
**Over 25000 pages of free information!**
© Copyright 1999-2004 American Immigration LLC, ILW.COM

Search for: Enter keyword(s)  **Search**  Advanced search

EXHIBIT  01



# Supreme Court Collection



legal information institute

collection home    Search [＿＿＿]    [--all decisions ▼]    [ search ]    donate

| GEORGIA V. ASHCROFT (02-182) |||||
|---|---|---|---|---|
| **195 F. Supp. 2d 25, vacated and remanded.** |||||
| **Syllabus** | **Opinion**<br>[ O'Connor ] | **Concurrence**<br>[ Kennedy ] | **Concurrence**<br>[ Thomas ] | **Dissent**<br>[ Souter ] |
| HTML version<br>PDF version | HTML version<br>PDF version | HTML version<br>PDF version | HTML version<br>PDF version | HTML version<br>PDF version |

## Syllabus

*NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being
done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337.*

# SUPREME COURT OF THE UNITED STATES

## GEORGIA *v.* ASHCROFT, ATTORNEY GENERAL, et al.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

No. 02—182. Argued April 29, 2003–Decided June 26, 2003

Georgia's 1997 State Senate districting plan is the benchmark plan for this litigation. That plan drew 56 districts, 11 of them with a total black population of over 50%, and 10 of them with a black voting age population of over 50%. The 2000 census revealed that these numbers had increased so that 13 districts had a black population of at least 50%, with the black voting age population exceeding 50% in 12 of those districts. After the 2000 census, the Georgia General Assembly began redistricting the Senate once again. It is uncontested that a substantial majority of Georgia's black voters vote Democratic, and that all elected black representatives in the General Assembly are Democrats. The Senator who chaired the subcommittee that developed the new plan testified he believed that as a district's black voting age population increased beyond what was necessary to elect a candidate, it would push the Senate more toward the Republicans, and correspondingly diminish the power of African-Americans overall. Thus, part of the Democrats' strategy was not only to maintain the number of majority-minority districts and increase the number of Democratic Senate seats, but also to increase the number of so-called "influence" districts, where black voters would be able to exert a significant–if not decisive–force in the election process. The new plan therefore "unpacked" the most heavily concentrated majority-minority districts in the benchmark plan, and created a number of new influence districts, drawing 13 districts with a majority-black voting age population, 13 additional districts with a black voting age population of between 30%—50%, and 4 other districts with a black voting age population of between 25%—30%. When the Senate adopted the new plan,

EXHIBIT  0 2

10 of the 11 black Senators voted for it. The Georgia House of Representatives passed the plan with 33 of the 34 black Representatives voting for it. No Republican in either body voted for the plan, making the votes of the black legislators necessary for passage. The Governor signed the Senate plan into law in 2001.

Because Georgia is a covered jurisdiction under §5 of the Voting Rights Act of 1965, it must submit any new voting "standard, practice, or procedure" for preclearance by either the United States Attorney General or the District Court for the District of Columbia in order to ensure that the change "does not have the purpose [or] effect of denying or abridging the right to vote on account of race or color," 42 U.S. C. §1973c. No change should be precleared if it "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U.S. 130, 141. In order to preclear its 2001 plan, Georgia filed suit in the District Court seeking a declaratory judgment that the plan does not violate §5. To satisfy its burden of proving nonretrogression, Georgia submitted detailed evidence documenting, among other things, the total population, total black population, black voting age population, percentage of black registered voters, and the overall percentage of Democratic votes in each district; evidence about how each of these statistics compared to the benchmark districts; testimony from numerous participants in the plan's enactment that it was designed to increase black voting strength throughout the State as well as to help ensure a continued Democratic majority in the Senate; expert testimony that black and nonblack voters have equal chances of electing their preferred candidate when the black voting age population of a district is at 44.3%; and, in response to the United States' objections, more detailed statistical evidence with respect to three proposed Senate districts that the United States found objectionable–Districts 2, 12, and 26–and two districts challenged by the intervenors–Districts 15 and 22. The United States argued that the plan should not be precleared because the changes to the boundaries of Districts 2, 12, and 26 unlawfully reduced black voters' ability to elect candidates of their choice. The United States' evidence focused only on those three districts and was not designed to permit the court to assess the plan's overall impact. The intervenors, four African-Americans, argued that retrogression had occurred in Districts 15 and 22, and presented proposed alternative plans and an expert report critiquing the State's expert report. A three-judge District Court panel held that the plan violated §5, and was therefore not entitled to preclearance.

Held:

1. The District Court did not err in allowing the private litigants to intervene. That court found that the intervenors' analysis of the plan identifies interests not adequately represented by the existing parties. Private parties may intervene in §5 actions assuming they meet the requirements of Federal Rule of Civil Procedure 24, *NAACP* v. *New York*, 413 U.S. 345, 365, and the District Court did not abuse its discretion in allowing intervention in this case, *see id.*, at 367. *Morris* v. *Gressette*, 432 U.S. 491, 504 — 505, in which the Court held that that the decision to object belongs only to the Attorney General, is distinguished because it concerned the administrative, not the judicial, preclearance process. *Morris* itself recognized the difference between the two. See *id.*, at 503 — 507. Pp. 11 — 13.

2. The District Court failed to consider all the relevant factors when it examined whether Georgia's Senate plan resulted in a retrogression of black voters' effective exercise of the electoral franchise. Pp. 11 — 27.

(a) Georgia's argument that a plan should be precleared under §5 if it would satisfy §2 of the Voting Rights Act, 42 U.S. C. §1973, is rejected. A §2 vote dilution violation is not an independent reason to deny §5 preclearance, because that would inevitably make §5 compliance contingent on §2 compliance and thereby replace §5 retrogression standards with those for §2. *Reno* v. *Bossier Parish School Bd.*, 520 U.S. 471, 477. Instead of showing that its plan is nondilutive under §2, Georgia must prove that it is nonretrogressive under §5. Pp. 13 — 15.

(b) To determine the meaning of "a retrogression in the position of racial minorities with respect

EXHIBIT    0 2

to their effective exercise of the electoral franchise," *Beer, supra*, at 141, the statewide plan must first be examined as a whole: First, the diminution of a minority group's effective exercise of the electoral franchise violates §5 only if the State cannot show that the gains in the plan as a whole offset the loss in a particular district. Second, all of the relevant circumstances must be examined, such as minority voters' ability to elect their candidate of choice, the extent of the minority group's opportunity to participate in the political process, and the feasibility of creating a nonretrogressive plan. See, *e.g., Johnson* v. *De Grandy*, 512 U.S. 997, 1011—1012, 1020—1021. In assessing the totality of the circumstances, a minority group's comparative ability to elect a candidate of its choice is an important factor, but it cannot be dispositive or exclusive. See, *e.g., Thornburg*, 478 U.S., at 47—50. To maximize such a group's electoral success, a State may choose to create either a certain number of "safe" districts in which it is highly likely that minority voters will be able to elect the candidate of their choice, see, *e.g., id.*, at 48—49, or a greater number of districts in which it is likely, although perhaps not quite as likely as under the benchmark plan, that minority voters will be able to elect their candidates, see *e.g., id.*, at 88—89 (O'Connor, J., concurring in judgment). Section 5 does not dictate that a State must pick one of these redistricting methods over the other. *Id.*, at 89. In considering the other highly relevant factor in a retrogression inquiry–the extent to which a new plan changes the minority group's opportunity to participate in the political process–a court must examine whether the plan adds or subtracts "influence districts" where minority voters may not be able to elect a candidate of choice but can play a substantial, if not decisive, role in the electoral process, cf., *e.g., Johnson, supra*, at 1007. In assessing these influence districts' comparative weight, it is important to consider "the likelihood that candidates elected without decisive minority support would be willing to take the minority's interests into account." *Thornburg*, 478 U.S., at 100 (O'Connor, J., concurring in judgment). Various studies suggest that the most effective way to maximize minority voting strength may be to create more influence or coalitional districts. Section 5 allows States to risk having fewer minority representatives in order to achieve greater overall representation of a minority group by increasing the number of representatives sympathetic to the interests of minority voters. See, *e.g., id.*, at 87—89, 99. Another method of assessing the group's opportunity to participate in the political process is to examine the comparative position of black representatives' legislative leadership, influence, and power. See *Johnson, supra*, at 1020. Maintaining or increasing legislative positions of power for minority voters' representatives of choice, while not dispositive by itself, can show the lack of retrogressive effect. And it is also significant, though not dispositive, whether the representatives elected from the very districts created and protected by the Voting Rights Act support the new plan. Pp. 15—21.

   (c) The District Court failed to consider all the relevant factors. First, although acknowledging the importance of assessing the statewide plan as a whole, the court focused too narrowly on proposed Senate Districts 2, 12, and 26, without examining the increases in the black voting age population that occurred in many of the other districts. Second, the court did not consider any factor beyond black voters' comparative ability to elect a candidate of their choice. It improperly rejected other evidence that the legislators representing the benchmark majority-minority districts support the plan; that the plan maintains those representatives' legislative influence; and that Georgia affirmatively decided that the best way to maximize black voting strength was to adopt a plan that "unpacked" the high concentration of minority voters in the majority-minority districts. In the face of Georgia's evidence of nonretrogression, the United States' only evidence was that it would be more difficult for minority voters to elect their candidate of choice in Districts 2, 12, and 26. Given the evidence submitted in this case, Georgia likely met its burden of showing nonretrogression. Section 5 gives States the flexibility to implement the type of plan that Georgia has submitted for preclearance– a plan that increases the number of districts with a majority-black voting age population, even if it means that minority voters in some of those districts will face a somewhat reduced opportunity to elect a candidate of their choice. Cf. *Thornburg, supra*, at 89 (O'Connor, J., concurring). While courts and the Justice Department should be vigilant in ensuring that States neither reduce minority voters' effective exercise of the electoral franchise nor discriminate against them, the Voting Rights Act, as properly interpreted, should encourage the transition to a society where race no longer matters. Pp. 21—27.



EXHIBIT    02

(d) The District Court is in a better position to reweigh all the facts in the record in the first instance in light of this Court's explication of retrogression. P. 27.

**195 F. Supp. 2d 25, vacated and remanded.**

*O'Connor, J., delivered the opinion of the Court, in which Rehnquist, C. J., and Scalia, Kennedy, and Thomas, JJ., joined. Kennedy, J., and Thomas, J., filed concurring opinions. Souter, J., filed a dissenting opinion, in which Stevens, Ginsburg, and Breyer, JJ., joined.*

copyright | about us | help

EXHIBIT    02



**National
Immigration
Law
Center**

# IMMIGRATION LAW & POLICY

## Removal Procedures and Defenses

### 3D CIRCUIT: UNLESS BIA REMAND IS EXPRESSLY LIMITED, IJ HAS JURISDICTION TO GRANT ANY RELIEF FOR WHICH RESPONDENT IS ELIGIBLE *(JOHNSON V. ASHCROFT)*

*Immigrants' Rights Update,* Vol. 16, No. 3, May 30, 2002

The U.S. Court of Appeals for the Third Circuit has reversed a ruling of the Board of Immigration Appeals that denied asylum and withholding of deportation to a Liberian national. The BIA had previously remanded the case to the immigration judge for purposes of considering eligibility under the Convention Against Torture (CAT). The IJ granted not only CAT relief but also asylum and withholding based on changed country conditions, and the BIA reversed the grant of asylum and withholding on the grounds that the IJ's jurisdiction on remand was limited to the application for CAT relief.

The Third Circuit reversed the BIA's denial of asylum and withholding based on established BIA precedent. The BIA and the parties "essentially agreed" that the scope of an IJ's jurisdiction on remand is governed by *Matter of Patel,* 16 I. & N. Dec. 600 (BIA 1978). In *Patel,* the BIA ruled that when it remands a case to an IJ, it divests itself of jurisdiction over the case unless it expressly retains jurisdiction and limits the remand. Unless the BIA both retains jurisdiction and limits the scope of remand, the IJ on remand may consider any matters deemed appropriate. In this case the BIA remanded the case "for consideration of the respondent's claim pursuant to CAT regulations" but neither expressly limited the remand to that issue nor expressly retained jurisdiction over the case. Accordingly, the court found that the BIA erred in concluding that the IJ lacked jurisdiction to grant asylum and withholding.

*Johnson v. Ashcroft,* __ F.3d __, No. 01-1331 (3d Cir. Apr. 16, 2002).

EXHIBIT 03

EXHIBIT 04

( Omitted )



# LII

legal information institute

## US CODE COLLECTION



collection home                    search                    donate

**TITLE 28 > PART V > CHAPTER 111 > § 1651**

**NOTES:**

**Source**

(June 25, 1948, ch. 646, 62 Stat. 944; May 24, 1949, ch. 139, § 90, 63 Stat. 102.)

**Historical and Revision Notes**

1948 Act

Based on title 28, U.S.C., 1940 ed., §§ 342, 376, 377 (Mar. 3, 1911, ch. 231, §§ 234, 261, 262, 36 Stat. 1156, 1162).

Section consolidates sections 342, 376, and 377 of title 28, U.S.C., 1940 ed., with necessary changes in phraseology.

Such section 342 provided:

"The Supreme Court shall have power to issue writs of prohibition to the district courts, when proceeding as courts of admiralty and maritime jurisdiction; and writs of mandamus, in cases warranted by the principles and usages of law, to any courts appointed under the authority of the United States, or to persons holding office under the authority of the United States, where a State, or an ambassador, or other public minister, or a consul, or vice consul is a party."

Such section 376 provided:

"Writs of ne exeat may be granted by any justice of the Supreme Court, in cases where they might be granted by the Supreme Court; and by any district judge, in cases where they might be granted by the district court of which he is a judge. But no writ of ne exeat shall be granted unless a suit in equity is commenced, and satisfactory proof is made to the court or judge granting the same that the defendant designs quickly to depart from the United States."

Such section 377 provided:

"The Supreme Court and the district courts shall have power to issue writs of scire facias. The Supreme Court, the circuit courts of appeals, and the district courts shall have power to issue all writs not specifically provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the usages and principles of law."

The special provisions of section 342 of title 28, U.S.C., 1940 ed., with reference to writs of prohibition and mandamus, admiralty courts and other courts and officers of the United States were omitted as unnecessary in view of the revised section.

The revised section extends the power to issue writs in aid of jurisdiction, to all courts established by Act of Congress, thus making explicit the right to exercise powers implied from


EXHIBIT    05

the creation of such courts.

The provisions of section 376 of title 28, U.S.C., 1940 ed., with respect to the powers of a justice or judge in issuing writs of ne exeat were changed and made the basis of subsection (b) of the revised section but the conditions and limitations on the writ of ne exeat were omitted as merely confirmatory of well-settled principles of law.

The provision in section 377 of title 28, U.S.C., 1940 ed., authorizing issuance of writs of scire facias, was omitted in view of rule 81(b) of the Federal Rules of Civil Procedure abolishing such writ. The revised section is expressive of the construction recently placed upon such section by the Supreme Court in U.S. Alkali Export Assn. v. U.S., 65 S.Ct. 1120, 325 U.S. 196, 89 L.Ed. 1554, and De Beers Consol. Mines v. U.S., 65 S.Ct. 1130, 325 U.S. 212, 89 L.Ed. 1566.

1949 Act

This section corrects a grammatical error in subsection (a) of section 1651 of title 28, U.S.C.

**Amendments**

1949—Subsec. (a). Act May 24, 1949, inserted "and" after "jurisdictions".

**Writ of Error**

Act Jan. 31, 1928, ch. 14, § 2, 45 Stat. 54, as amended Apr. 26, 1928, ch. 440, 45 Stat. 466; June 25, 1948, ch. 646, § 23, 62 Stat. 990, provided that: "All Acts of Congress referring to writs of error shall be construed as amended to the extent necessary to substitute appeal for writ of error."

**Section Referred to in Other Sections**

This section is referred to in sections 1407, 3202 of this title.

**credits**                              **about us**                              **send email**


EXHIBIT 05

Section 2201. Creation of remedy                                        Page 1 of 1

**Laws: Cases and Codes : U.S. Code : Title 28 : Section 2201**

[ _____ ]   [ Search ]   [ Title 28      ▼ ]

- United States Code
  - TITLE 28 - JUDICIARY AND JUDICIAL PROCEDURE
    - PART VI - PARTICULAR PROCEEDINGS
      - CHAPTER 151 - DECLARATORY JUDGMENTS

*U.S. Code as of: 01/22/02*

**Section 2201. Creation of remedy**                    **Related Res**

(a) In a case of actual controversy within its jurisdiction,      Judiciary Leg
except with respect to Federal taxes other than actions brought
under section 7428 of the Internal Revenue Code of 1986, a       Litigation Leg
proceeding under section 505 or 1146 of title 11, or in any civil
action involving an antidumping or countervailing duty proceeding    U.S. Legal !
regarding a class or kind of merchandise of a free trade area         Summa
country (as defined in section 516A(f)(10) of the Tariff Act of
1930), as determined by the administering authority, any court of    Judiciary Dis
the United States, upon the filing of an appropriate pleading, may
declare the rights and other legal relations of any interested
party seeking such declaration, whether or not further relief is or
could be sought.  Any such declaration shall have the force and
effect of a final judgment or decree and shall be reviewable as
such.
(b) For limitations on actions brought with respect to drug
patents see section 505 or 512 of the Federal Food, Drug, and
Cosmetic Act.

**[Notes]**                                    **Next**


EXHIBIT  0 6